IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JUAN E. ORTIZ, by and through his next friend, RAMÓN L. ORTIZ, 418 Mt. Prospect Ave., Apt. 8 Newark, NJ 07104<br><br>        Plaintiff,<br><br>vs.<br><br>CITY OF CLEVELAND, OHIO<br><br>        Defendant. | Case No.<br><br>Judge<br><br>Magistrate Judge |

**COMPLAINT WITH JURY DEMAND**

**NATURE OF ACTION**

1.      This is a civil-rights action brought under 42 U.S.C. § 1983 seeking compensatory

damages. First, this case alleges that the City of Cleveland and its Division of Police

violated the Fourth and Fourteenth Amendments of the United States Constitution by

adopting customs and policies that encouraged police officers to use excessive force.

Second, the City of Cleveland and its Division of Police have adopted a custom, policy, or

practice that fails to train police officers on how to deal with a foreseeable population of

individuals: the disabled and individuals with diminished capacity. These customs, policies, and practices led to the unreasonable, forcible detention of Juan Ortiz, a teenager with Down syndrome.

2.      The Defendant's unreasonable practices, customs, and policy, coupled with the deliberate indifference demonstrated by the City's failure to discipline officers who used excessive force, directly and proximately caused Juan's injuries.

## PARTIES

3.      Plaintiff Juan Ortiz resides in Newark, New Jersey with his next friend and father, Ramón Ortiz.

4.      Defendant City of Cleveland is a municipal corporation under the Ohio Constitution Art. XVIII and a "person" subject to suit within the meaning of 42 U.S.C. § 1983. It is vested with the supervision of the Cleveland Division of Police.

## JURISDICTION AND VENUE

5.      Jurisdiction over federal claims under 42 U.S.C. §§ 1983 and 1988, which provides for attorney and expert fees for vindication of civil-rights claims, is asserted under 28 U.S.C. §§ 1331 and 1343.

6.      This Court has personal jurisdiction over the Defendant and venue is proper in this Court under 28 U.S.C. § 1391 because the events giving rise to Plaintiff's claims took place within the Court's jurisdiction.

## FACTUAL BACKGROUND

7.      On or about August 16, 2010, Patrol Officers Brian Kazimer #844 and Dan Crisan #263 of the Cleveland Division of Police were on duty driving patrol car #111. They received a report that Timothy Krall had called 911 from Conrad's Tire on Cleveland's

west side to report that he was robbed of his wallet by a white male approximately 5'8"
tall wearing a long white shirt and some type of hat.

8.      Approximately a half hour later, the officers were advised by radio that Nina
Kennedy, manager of the West Terrace Apartments, called 911 to report that two males
approached her and gave her a wallet. They told her that they had found the wallet on
the sidewalk by one of the apartment buildings. They asked someone nearby where they
could find the manager and were directed to her office. They knocked on her door,
handed her the wallet, and suggested that she call the police. Ms. Kennedy gave the
police a description of the two men as white, one in his 40s wearing a red shirt and the
other in his 50s wearing a blue shirt.

9.      Turning in a found wallet is not a crime. The men who turned in the wallet to Ms.
Kennedy were Good Samaritans who had no involvement in the robbery of Mr. Krall.

10.     On August 16, 2010, Juan and his parents lived in the West Terrace Apartments.
When the incident began, Juan was on the sidewalk next to his apartment building
wearing headphone and listening to music on his Walkman® radio. He was wearing a
red t-shirt and jeans. Juan is a male child with Down syndrome and attendant speech
and learning disorders. He is of Puerto Rican descent and has a dark complexion. At the
time of the incident, Juan was 4'11" tall and weighed 118 pounds. He was 16, but
appeared much younger. He posed no threat to the officers or to the public. He did not
match the description of either the robbery suspect (as described to police dispatch by
Mr. Krall) or the Good Samaritans who turned in the wallet (as described to police
dispatch by Ms. Kennedy). No reasonable police officer could mistake Juan for an adult
white man, and it was objectively unreasonable to do so.

11.     The officers pulled into the apartment complex and began shouting at Juan. Juan who neither understands nor speaks English (and was wearing headphones at the time), was startled and fearful. He ran to his parents, who were out in the front of the apartment building. Officer Kazimer chased Juan on foot along the sidewalk and down a small hill to where Juan's parents were standing in the parking lot. Officer Crisan stayed in the cruiser and drove around to the front of the apartment building.

12.     When Officer Crisan reported on the police radio that his partner was in pursuit of Juan, Officer Crisan described Juan as a "black male."

13.     Neither the robbery suspect nor the Good Samaritans who turned in the wallet were described as black.

14.     Neither Juan nor his parents had any idea why the police were chasing Juan.

15.     As Juan ran to his mother, Eliezer Manzano, a resident of the apartment complex, stepped in front of Officer Kazimer and told him that Juan had Down syndrome and could not understand what the officer was saying. Manzano told Officer Kazimer that he could help him. Officer Kazimer responded, "Shut up, get out of my way." Manzano complied.

16.     Catching up with the fleeing child, Officer Kazimer tackled and slammed Juan into a parked car. The radio Juan had beóen carrying flew out of Juan's arms. Officer Kazimer used his weight to pin Juan against the car. Officer Kazimer is substantially larger and stronger than Juan. Juan remained terrified and fearful. Additional cars arrived on the scene.

17.     As these officers detained Juan, Ramón explained that his son has Down syndrome and pleaded with the officers to let Juan go. Manzano, who had followed Kazimer as he chased Juan, again tried to explain to the officers that Juan had Down

syndrome. Ramón tried to put his hand under his son's face to protect his skin from the heat of the car but Officer Kazimer refused to permit it. When Ms. Perez tried to intervene to protect her son, pleading with them not to hurt her "baby," Officer Kazimer shoved her away and she fell into the grass next to the apartment building. Both parents were in fear for Juan's safety and well-being, as well as their own.

18.     At this point, other family and friends on the scene told the officers the Juan had Down syndrome. Ms. Kennedy, who initially called the police, yelled from a second story window that the police had the wrong person.

19.     The officers nevertheless continued to abuse Juan, pulled his hands behind his back, then pushed his arms up towards his shoulders and handcuffed him. Juan continued to cry as the officers stood him next to the patrol car as if he had done something wrong.

20.     Ramón Ortiz continued to explain to the officers that his son had Down syndrome. Officer Kazimer said, "I don't care." He then said, "you're lucky we didn't shoot him" and told Mr. Ortiz to "shut the fuck up."

21.     Malvin Perez, Juan's older brother, attempted to explain to Officer Crisan that Juan has Down syndrome and Officer Kazimer was making a mistake. Officer Crisan pulled out his Taser, pointed it at Malvin, who was holding his infant child in his arms, and told him to "shut up or you're going to jail."

22.     Officer Crisan then said to the rest of Juan's family, in the presence of multiple witnesses, "You don't know English, shut up, you shouldn't live in the United States if you don't know English." One of the officers called Alma a "Mexican wetback."

23.    This malicious abuse of power and disrespect for members of the public attempting to prevent further harm to the handicapped child Juan is shocking to the conscience. These threats led Juan and his parents to be terrified and fearful.

24.    For more than 20 minutes, the officers detained Juan and kept him from his parents. The officers refused Juan's parents' pleas to be near and comfort his son.

25.    A well-trained officer would not have initiated the seizure or used the kind of force that Officer Kazimer used against Juan. A well-trained officer would have recognized that Juan was not white. A well-trained officer would have recognized that Juan was a child and that he had Down syndrome. Officer Kazimer attacked and detained Juan without probable cause. Kazimer used a grossly unnecessary amount of force to detain a small, brown, mentally handicapped child, which was unjustifiable under the circumstances. The amount of force used to accomplish the detention was clearly excessive and objectively unreasonable under Fourth Amendment seizure principles. Kazimer acted in an unprofessional manner towards Juan, his parents, and other bystanders who were explaining Juan's handicap and language limitations. All of these actions caused damages to Juan.

26.    A well-trained officer would not stand by and permit a fellow officer to abuse a handicapped child or his parents. Officer Crisan was in a position to observe Officer Kazimer's unconstitutional conduct and had a duty to intervene to protect Juan and prevent the damages that occurred as a result of the unlawful attack, seizure, and detention. Officer Crisan failed to do so, demonstrating that the City had failed in its obligation to adequately train officers to protect the most vulnerable members of the community from police abuse.

27.     Juan was finally released when the officers reached the conclusion that any reasonable officer would have known simply from looking at Juan: he did not match the description of the robbery suspect—or of the Good Samaritans who had turned in the wallet—and had no involvement in the crime.

28.     After the incident, Juan's parents took him to the hospital where he received medical treatment for chest pain and bruising. He was later treated for a suprapubic abscess he sustained as a result of the attack. Officer Kazimer had burned Juan's skin by holding him against the hood of the hot car. By slamming and tackling Juan and pinning him to this hot car (all without any cause to do so), Officer Kazimer caused physical harm to Juan. This harm required surgical intervention, with the attendant risks, pain, and suffering.

29.     On August 17, 2010, Ramón Ortiz, on behalf of Juan, filed a complaint with the Cleveland's Office of Professional Standards.

30.     On November 9, 2010, the Civilian Police Review Board sustained Mr. Ortiz's complaint regarding the conduct that injured Juan. The letter also stated that the Review Board recommended that the Chief of Police, then Michael McGrath, discipline Officers Kazimer and Crisan for their conduct towards Juan. Among other findings, the Review Board found that Officers Kazimer and Crisan violated the following Rules and Regulations from the Manual for Conduct and Discipline of Officers and Employees: 4.05–officers shall use only the amount of force reasonably necessary to effect the arrest and detention of subjects; 5.01–personnel shall not engage in any conduct, speech or acts…which would reasonably tend to diminish the esteem of the Division of Police or its personnel in the eyes of the public; and 5.09–personnel shall conduct themselves in such a manner as to command the respect of the public.

31.     The Cleveland Codified Ordinances provide that "within ten days after the receipt of [the Civilian Police Review Board's] recommendation, the Chief of Police shall notify the Board in writing whether he has decided to suspend the officer or employee." CCO § 115–4.

32.     On August 1, 2011, almost a year after the officers attacked Juan and nine months after the Civilian Police Review Board sustained Mr. Ortiz's complaint, Chief McGrath sent a letter to Officers Kazimer and Crisan to inform them that pre-disciplinary hearings had been scheduled for August 8, 2011.

33.     On August 8, 2011, Officers Kazimer and Crisan attended a pre-disciplinary hearing accompanied by union president Stephen Loomis, First Vice President Jeffrey Follmer, and Attorney Patrick D'Angelo of the Cleveland Police Patrolmen's Association, President Marcus Saffo of the Black Shield Police Association, Administrator Cassandra Bledso, Sergeant Andrea Douglas and Investigator Anitra Merritt of the Office of Professional Standards, Sergeant Keith Campbell of the Case Preparations Office, and the Hearing Officer Deputy Chief Edward Tomba. According to a letter dated the same day Chief McGrath decided to grant the officers' request to hold their discipline in abeyance until the conclusion of Juan's civil suit against the officers.

34.     The City just last month, on September 12, 2016, provided to Plaintiff's counsel these letters indicating that (1) a pre-disciplinary hearing was scheduled for Kazimer and Crisan, (2) that although the hearing was apparently held, at the officers' request the recommended discipline was held in abeyance pending litigation, and (3) that the police chief let Kazimer and Crisan avoid accountability by failing to impose discipline, including for blatantly racist behavior and language, and using excessive force against a disabled child.

35.     Plaintiff's counsel first asked for these records in 2011. On October 25, 2011, Plaintiff's counsel specifically requested that the City of Cleveland's public-records administrator Kim Roberson provide all records regarding discipline and consideration of discipline of these officers based upon the Civilian Police Review Board's November 9, 2010 recommendation. The City failed to produce the records.

36.     On or about December 29, 2011, Plaintiff's counsel issued a subpoena duces tecum to the City of Cleveland in the related *Ortiz v. Kazimer*, *et al.* case before this Court. McGrath's August 1 and 8, 2011 letters to Kazimer and Crisan were also directly responsive to that subpoena, which asked for the officers' personnel files and records regarding discipline or consideration of discipline for the August 16, 2010 incident. But the City never provided the documents. Instead, the City through Assistant Law Director Stacey Fernengel on January 30, 2012 insisted in writing that documents she produced on Kazimer and Crisan's behalf on January 17, 2012 were all the documents in the City's possession responsive to the subpoena.

37.     That was false. The City thus intentionally attempted to mislead, influence, and hinder Plaintiff, Plaintiffs' counsel (acting as officers of the Court issuing the subpoena in the *Ortiz v. Kazimer* case), and by extension, the Court in *Ortiz v. Kazimer* and eventual jurors.

38.     Cleveland finally produced these records in response to a December 9, 2015 public-records request, and only after Plaintiff Juan Ortiz on March 24, 2016 filed mandamus litigation in the Supreme Court of Ohio to enforce the request. Yet, as explained above, the records had also been responsive to requests from years earlier.

39.     The City failed to provide until September 12, *2016* documents regarding the August 8, 2011 pre-disciplinary hearing (both scheduling it and deciding to hold

discipline in abeyance) when the City finally responded to Plaintiff's December 2015 public-records request.

40.     To date, the Chief of Police has failed to notify the Civilian Police Review Board of whether he has decided to suspend the officers under CCO § 115-4.

41.     Five years after their pre-disciplinary meeting, the Division of Police has not disciplined either officer for attacking Juan Ortiz. This was not the first time, nor the last, that the City of Cleveland would fail to discipline officers for using excessive force.

### The City failed to discipline Officer Crisan for his earlier use of excessive force against teenagers.

42.     On April 19, 2004, while off duty, Officer Crisan claimed that he "accidentally" fired his firearm—twice—during a spat with a group of teenagers fighting near the boundary of his property.

43.     Crisan claimed that the first gunshot—fired up in the air—occurred after he tripped over a tree root.

44.     Crisan claimed that the second gunshot, during which his weapon was pointed toward the ground, occurred as a "result of a defensive reflex" as he stepped away from a teenager who was being "verbally abusive."

45.     Officer Crisan collected his own shell casings before the investigating officers arrived.

46.     No charges were filed in the case, but after investigating the incident, Sergeant Louis Knowles of Internal Affairs recommended "disciplinary charges commensurate with his violation of the *Use of Deadly Force* GPO and/or re-instruction and re-training at the outdoor range training facility."

47.     As of this lawsuit's filing, there is no record of any discipline or re-training administered to Crisan in connection with this improper use of deadly force.

**The City also failed to discipline Officer Crisan for his use of excessive force against a pedestrian Crisan had no probable cause to even stop.**

48.     On April 27, 2011, Ellis Gums filed a complaint with the Civilian Police Review Board against Crisan and others for an unreasonable search and seizure that led to an arrest.

49.     Mr. Gums was walking to a grocery store to buy milk for his newborn baby, when a group of detectives, including Crisan, harassed, detained, searched, and arrested him.

50.     As in Juan's case, the Civilian Police Review Board recommended discipline and retraining for the officers involved. As of the filing of this case, there is no record of any discipline or retraining given to the officers involved, including Officer Crisan.

**For years, the City of Cleveland has tolerated and endorsed the use of excessive force by members of the Division of Police.**

51.     At the time of Juan Ortiz's attack, the City of Cleveland had a long history of police officers using excessive force. The City knew about this pattern and practice of excessive force by its police officers, tolerated it, and sanctioned it.

52.     In December 2014, the United States Department of Justice Civil Rights Division released its investigation into Cleveland Police practices ("DOJ Report") detailing its findings that the City of Cleveland failed to adequately address an ongoing pattern and practice of police excessive force.

53.     The DOJ Report found that there was reasonable cause to believe that the City of Cleveland Division of Police engages in a pattern or practice of using unreasonable and unnecessary force in violation of the Fourth Amendment of the United States Constitution.

54.     The DOJ Report concluded that Cleveland police officers engaged in a policy of applying force in retaliation to verbal and physical resistance to their demands.

55.     The DOJ Report found that Cleveland police officers often escalated situations and lost their patience when dealing with people who did not immediately cooperate with officer demands, which increased the officer's tendency to use force.

56.     Indeed, the personnel file of one of the officers involved in Juan Ortiz's case contains multiple Use of Non-Deadly Force ("UNDF") reports.

57.     In one case, Officer Crisan arrested a woman that raised her voice at him during an off-duty confrontation. Rather than investigating the victim's injury, or her claim that Officer Crisan slapped her before handcuffing her, Cleveland police officials focused instead on whether or not Officer Crisan properly notified the Division of his secondary employment.

58.     The DOJ Report found that the City recklessly, wantonly, and/or intentionally does not train its police officers to deal with people with mental-health disabilities or impaired faculties. As a result, Cleveland police officers often use excessive force in cases where minimum or no force would be necessary.

59.     For example, in one instance, the DOJ Report found that Cleveland police officers had used a Taser on a man who *was already strapped to a EMS gurney* and who was suffering from seizures.

60.     In another instance, the DOJ Report found that Cleveland police officers tased a suicidal deaf man who may not have understood the officers.

61.     The deaf man, "Larry," merely attempted to avoid being pulled on by two officers. As Larry pulled away, one officer tased him in the chest. Throughout the whole struggle,

he was neither a threat to community or to the officers. Rather than attempting crisis-intervention techniques, officers used their taser to force Larry's compliance.

62.     The DOJ Report found that this abuse of "Larry" was a direct result of the City's failure to train officers on how to adequately address people with physical and mental disabilities.

63.     The DOJ Report found in another instance that officers sprayed pepper spray over a spit sock worn by a handcuffed mentally ill suspect. The suspect, who was spitting on officers, had the sock placed over his head to prevent any further transfer of bodily fluid. When the suspect tried to kick the window of the zone car, the sergeant sprayed the suspect with OC spray over his spit sock. Rather than immediately decontaminating the suspect, the sergeant required the suspect to wear the OC contaminated spit sock until he arrived at a hospital. Supervisors did not question or investigate his excessive and gratuitous use of force. The sergeant received no discipline for his actions.

64.     When the Civilian Police Review Board sustains an improper use-of-force finding, the City recklessly, wantonly, and/or intentionally does not discipline the offending officers. The DOJ Report reported that only 51 officers were disciplined—out of a sworn force of 1,500—over a three-year period for a use-of-force violations; and the majority were disciplined for procedural errors (such as not filing an administrative report about using force).

65.     This failure to discipline officers extends to a myriad of instances that demonstrate that Cleveland simply does not hold officers accountable when they physically abuse members of the public without justification or when they exceed the force necessary under the circumstances.

66.     The DOJ Report provides an example in which a police video shows Cleveland police officers using excessive force–including kicks to the head–against Edward Henderson, an unarmed man who was already handcuffed and prone on the ground. Following the attack, Mr. Henderson was taken to the hospital where he was treated for a broken orbital bone.

67.     None of the officers reported the use of force against Mr. Henderson and none of the officers were disciplined for the attack, or even for their failure to report the attack.

68.     Furthermore, when use of force is reported, officers—with supervisor approval— often used boilerplate language to describe their actions. Thus, reports that should allow supervisors to assess constitutional violations are often deficient in providing supervisors with information on what force was even used during the encounter.

69.     Cleveland police officers reported to the Justice Department that, not only do supervisors fail to provide guidance on reporting use of force, but that some supervisors actively discourage reporting force.

70.     The DOJ Report found that the City's failures are such that it cannot timely, properly, and effectively determine how much force its officers are using and under what circumstances, whether the force was reasonable, and if not, what discipline, change in policy, training, or other action is appropriate.  This custom/policy not only sanctions officer abuse but encourages officer abuse like the kind that injured Juan.

71.     Thus, it was no surprise that the Justice Department determined that several of the City's systems for investigating and holding officers accountable for the use of excessive force are flawed, including Internal Affairs, the Use of Deadly Force Investigation Team, and the Tactical Review Committee. Often, the investigations were conducted with the intent to justify the officers' actions rather than discern the truth. In

fact, numerous investigators admitted to the Justice Department that the quality of the investigations is compromised by investigators' apparent bias in favor of clearing the officer instead of objectively pursuing all of the available facts.

72.     Some investigating officers responsible for reviewing officers' use of force admitted that they investigate with the goal of casting the officer in the best light possible, and most officers applied the improper "beyond a reasonable doubt" evidentiary standard when determining whether the officer used excessive and/or unreasonable force.

73.     The DOJ Report elaborated that: "It is almost as if the goal of the chain of command in many incidents is not to create a complete record of the incident that can be subjected to internal and external review."

### For years the City has adopted an unjustifiable and unwritten policy of delaying discipline until the conclusion of concurrent civil litigation

74.     Furthermore, the City has adopted an unjustifiable policy of delaying disciplinary hearings until the conclusion of pending civil litigation against officers.

75.     In Juan's case, it has been six years since the Civilian Police Review Board sustained a finding of improper conduct against Officers Kazimer and Crisan and recommended discipline. In the meantime, the department has failed to take any steps to hold either officer accountable for his actions that day, and has *promoted* Crisan to the rank to Sergeant.

76.     On February 11, 2015, the weekly newspaper, *Cleveland Scene*, published an article on Juan Ortiz's case titled, "'You're Lucky We Didn't Shoot Him': In 2011, Cleveland Police Roughed Up an Innocent 16-Year-Old Boy with Down Syndrome. The Family is Still Looking for Justice," by Doug Brown.

77.     For the first time, the article revealed the City's official policy on disciplining officers in a written statement: "Administrative discipline in the Ortiz matter has not yet been conducted due to pending civil litigation. The assertion that Officers Kazimer and Crisan were never disciplined is incorrect, the administrative disciplinary process in this matter will begin once the pending civil litigation has been settled. At the time of the incident (2010), it was the policy of the City of Cleveland to hold off on the administrative disciplinary process until all pending civil and criminal matters were settled. Since 2012, the city has changed its policy to allow for administrative discipline to run concurrently with any civil litigation. Administrative discipline in any criminal matter will still occur at the conclusion of the criminal matter."

78.     City officials repeated this statement again to journalist Kristin Volk of NewsNet 5 on February 19, 2015.

79.      Despite their assertion that the policy has changed, Officers Kazimer and Crisan have yet to face any discipline for attacking Juan. It has now been six years since Juan's attack.

80.     As the DOJ Report noted, holding discipline in abeyance, "prevents the Division from swiftly holding officers accountable and sends a message to other officers that they need not fear discipline for their actions."

81.     The DOJ Report found this practice, policy, or custom to be unacceptable.

82.     This practice, policy, or custom leads to violations of constitutional rights.

83.     The City's policy is designed to prevent victims of police brutality and other unconstitutional officer conduct from holding officers accountable. The City's policy of holding discipline in abeyance until civil suits are resolved has the purpose and effect of avoiding creating records that victims could use in civil litigation, such as evidence that

the City disciplined the officers for their behavior that is the subject matter of the suit. As a result, violent and racist officers escape accountability.

84.     The City's objective in trying not to create evidence that would benefit plaintiffs goes hand in hand with its current practice of trying to avoid indemnification of officers found liable for constitutional violations.

85.     Ohio Rev. Code § 2744.07 requires the City to indemnify officers found liable for actions taken in good faith within the course and scope of their employment (except for punitive damages).

86.     In multiple cases, the City has paid for officers to declare bankruptcy to try to discharge judgments in favor of civil plaintiffs alleging unconstitutional misconduct by defendant police officers, and then insisting that the City has no obligation to pay because the judgment has been discharged.

87.     Last week, in *David Ayers v. City of Cleveland*, Cuyahoga Common Pleas Case No. CV-15-846683, Judge Robert C. McClelland ruled that the City could not avoid indemnification by having a defendant officer declare bankruptcy in a case regarding Ayers's wrongful conviction in 1999. The City immediately filed a notice of appeal to try to avoid paying the $13.7 million verdict in Ayers's favor.

88.     The City has employed this same tactic in the civil suit over the wrongful death of Kenny Smith in 2012, whose estate was awarded $5.5 million last year. The City is appealing.

**For years, the City of Cleveland has tolerated and endorsed the use of racial discrimination by members of the Division of Police.**

89.     While the DOJ Report explicitly stated that DOJ made "no finding regarding racial profiling, we must report that when we interviewed members of the community

about their experiences with the police, many African-Americans reported that they believe CDP officers are verbally and physically aggressive toward them because of their race."

90.     Furthermore, DOJ found that "CDP's method of policing contributes to the community's distrust of and lack of respect for officers" and that "members of racial, ethnic, and language minorities, expressed public outrage at the way they perceive that their communities are treated by CPD." This disparate treatment extends to officers in supervisory roles. The Report stated that "when community members attempt to file complaints about mistreatment at the hands of CDP officers, they are met with barriers and resistance."

91.     The DOJ's findings are consistent with the treatment and comments levied at Juan Ortiz and his family on August 16, 2010.

92.     The Division of Police's racist culture permeates throughout out its ranks. In October 2016, the Cleveland Police Patrolman's Association, lead by CPPA President Steve Loomis, issued their very first presidential endorsement ever for Republican nominee Donald J. Trump, by a vote of 216-68. Mr. Trump, whose campaign has been widely endorsed by white supremacist groups—including former Imperial Wizard of the Ku Klux Klan, David Duke—has been overtly and transparently racist. Trump questioned President Obama's birthplace even after the President's short-form and long-form birth certificates were publicly released. Trump called Mexican immigrants rapists. He questioned whether an American-born judge of Mexican heritage could fairly hear a case regarding Trump University, solely by virtue of ethnicity, something even Trump's fellow Republican, Speaker of the House of Representatives Paul Ryan, called the "definition" of racist. Most recently, Trump advocated for an unconstitutional

nationwide stop-and-frisk program that would disproportionately target ethnic minorities.

93.     The endorsement was controversial even within the ranks of the Division of Police. Lynn Hampton, President of the Black Shield, which represents African-American police officers called the vote "a slap in the face," and worried about the endorsement's effect on the Division's attempt to improve its relationship with the community.

94.     Trump's vile behavior—and the police union's overwhelming embrace of Trump—is consistent with the officers' unbridled racist statements toward Juan Ortiz and his family. The City's failure to hold Kazimer and Crisan responsible—and impose the discipline the Civilian Police Review Board recommended including for racist epithets—is further evidence that the Defendant City has no intention to hold Kazimer or Crisan accountable.

**The City of Cleveland has already broken the consent decree by promoting Sergeant Crisan without considering his multiple disciplinary charges.**

95.     On May 26, 2015 the DOJ settled its lawsuit with City of Cleveland and signed a court-enforced consent decree. Monitored by Judge Solomon Oliver, Jr., the agreement was designed to address DOJ's findings that the Division of Police engaged in a pattern or practice of using excessive force in violation of the Fourth Amendment.

96.     Among other requirements, the consent decree mandates that supervisors should consider officers' numbers and circumstances of use of force, their disciplinary records, interpersonal skills, and whether or not they are subject to pending discipline before granting promotions.

97.     And yet, sometime during the fall of 2015, the Division of Police promoted Officer Crisan to the rank of Sergeant. The promotion occurred despite allegations of racist conduct, multiple pending disciplinary hearings from Civilian Police Review Board, and a pending disciplinary hearing and training recommendation for the discharge of his weapon.

### Juan was injured as a result of the City's custom, policy, or practice of tolerating and encouraging the use of excessive force by its Division of Police.

98.     Juan's attack is consistent with the Justice Department's findings. Not only did Kazimer and Crisan fail to report the force they used on Juan, the City has failed to discipline the officers, even after the Civilian Police Review Board sustained Ramón Ortiz's complaint to the Office of Professional Standards and recommended that the officers be disciplined. Furthermore, the City has failed to investigate the racist comments, described above, that the officers levied at Juan's family as they tried to come to his aid. The City continued to fail to do so even after third-party witnesses provided testimony to the *Ortiz v. Kazimer* Court statements under penalty of perjury describing the officers' misconduct and racist language.

99.     Since being attacked and berated by Officer Kazimer, Juan's ability to perform and enjoy his usual activities has been impaired. He has suffered severe emotional distress, sleeplessness, and related emotional anxiety as a result of his mistreatment. He awakens at night and paces the house. If he sees a police officer, he has particular trouble sleeping that night. He compulsively bites his index finger out of anxiety brought on by the attack. If he hears a siren, he locks himself in his room. He has also experienced intestinal distress as a result of the attack. His physical injuries were due to

the unreasonable and unnecessary force condoned and encouraged by the City of Cleveland.

100.   As a direct and proximate result of the City's intentional and/or negligent acts, Juan sustained severe mental and physical pain and suffering and injuries in an amount to be determined at trial.

101.   Juan is entitled to compensatory damages for the harms inflicted upon him.

## COUNT 1
### Fourth and Fourteenth Amendment violation under 42 U.S.C. § 1983 for a custom, policy, or practice of using excessive force

102.   Plaintiff incorporates all previous allegations by reference.

103.   Defendant City, through its Division of Police, permitted, tolerated, and was deliberately indifferent to a pattern and practice of excessive force by its police officers at and around the time of Juan Ortiz's attack. This widespread tolerance of excessive force by police officers constituted a municipal policy, practice, or custom and led to Juan Ortiz's assault, tackling, handcuffing, and arrest.

104.   By permitting, tolerating, and sanctioning a persistent and widespread policy, practice, and custom of excessive force under which Juan Ortiz was assaulted, the Defendant City deprived Juan Ortiz of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, the right to be free from gratuitous and excessive force guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

105.   As a direct and proximate result of Defendant's unlawful conduct, Juan suffered and will continue to suffer economic and non-economic damages for which the Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

**COUNT 2**
**Fourth and Fourteenth Amendment violation under 42 U.S.C. § 1983 for deliberate indifference/failure to train police officers on how to interact with disabled individuals or individuals with mental illness or impaired faculties**

106.    Plaintiff incorporates all previous allegations by reference.

107.    Defendant City, through the Division of Police, and acting under the pretense and color of law, created, permitted, tolerated, and was deliberately indifferent to a pattern and practice of deliberate indifference to training officers on how to interact with disabled individuals or individuals with mental illness or impaired faculties. This widespread denial of training for a foreseeable population that will interact with police officers constitutes a municipal policy, practice, or custom and led to Juan Ortiz's assault.

108.    By permitting, tolerating, and sanctioning a persistent and widespread policy, practice, and custom under which Juan Ortiz was attacked, Defendant City deprived Juan of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, the right to interact with police officers without deliberate indifference to his disability.

109.    As a direct and proximate result of Defendant's unlawful conduct, Juan suffered and will continue to suffer economic and non-economic damages for which the Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

**COUNT 3**
**Fourth and Fourteenth Amendment violation under 42 U.S.C. § 1983 for deliberate indifference/failure to discipline officers' unreasonable seizure and excessive use of force against Juan**

110.    Plaintiff incorporates all previous allegations by reference.

111.     Plaintiffs are informed and believe that high-ranking City officials, including

former Chief (and now Public Safety Director) Michael McGrath, current Chief Calvin

Williams, and senior police supervisors, implicitly condoned police officers' excessive

use of force by failing to discipline officers.

112.     The City's deliberate indifference signals to officers that they should not fear

discipline for using excessive force.

113.     By permitting, tolerating, and sanctioning a persistent and widespread policy,

practice, and custom under which Juan Ortiz was attacked, Defendant City deprived

Juan Ortiz of the rights, remedies, privileges, and immunities guaranteed to every

citizen of the United States as secured by 42 U.S.C. § 1983, including, but not limited to,

the right to be secure in one's person, and not subject to unreasonable search and

seizure or excessive force.

114.     As a direct and proximate result of Defendant's unlawful conduct, Juan suffered

and will continue to suffer economic and non-economic damages for which the

Defendant is liable, including, but not limited to, mental, emotional, and physical pain

and suffering.

### COUNT 4
### Intimidation (Using Materially False or Fraudulent Writings to Attempt to Influence and Hinder Public Servants) under Ohio Rev. Code § 2921.03(a) and (c)

115.     Plaintiff incorporates all previous allegations.

116.     As described above, City officials acting on the City's behalf created, used, and/or

caused to be used one or more materially false or fraudulent writings with malicious

purpose, in bad faith, and in a wanton or reckless manner, to attempt to influence or

hinder public servant(s) in the discharge of their duty.

117.    The materially false or fraudulent writings that Defendant the City of Cleveland used included various false representations that documents reflecting the police chief's failure to discipline did not exist.

118.    These records were intended to influence or hinder public servants in the discharge of their duties.

119.    Defendant is liable for the injury and loss Plaintiff suffered as a result of this use of materially false or fraudulent writings.

120.    Defendant is liable to Plaintiff for reasonable attorney's fees, court costs, and other expenses incurred as a result of prosecuting this civil action.

## PRAYER FOR RELIEF

For the reasons stated above, Plaintiff respectfully requests the following relief from the Court.

A.    Declare that Defendant's acts and conduct constitute violations of the Fourth and Fourteenth Amendments of the U.S. Constitution under 42 U.S.C. §§ 1983;

B.    Judgment in Plaintiff's favor as to all claims for relief;

C.    Special and general damages to compensate for the injuries Juan sustained due to the City's unconstitutional customs, policies, and practices including economic and non-economic damages for medical costs, pain, suffering, humiliation, and emotional distress;

D.    Exemplary damages, pre-judgment interest, post-judgment interest, costs, and other reasonable expenses incurred in maintaining this action, and the reasonable attorneys' fees and costs incurred in maintaining this action; and

E.    All other relief in law or equity to which Plaintiff is entitled and that the Court deems equitable, just, or proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues within this Complaint.

Respectfully submitted,

THE CHANDRA LAW FIRM, LLC

*/s/ Subodh Chandra*
Subodh Chandra (0069233)
Donald Screen (00440770)
Ashlie Case Sletvold (0079477)
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Donald.Screen@ChandraLaw.com
Ashlie.Sletvold@ChandraLaw.com

*Attorneys for Plaintiff Juan Ortiz*